Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | Martin C. Ashman |
|---|---|---|---|
| **CASE NUMBER** | 02 C 4284 | **DATE** | 3/11/2004 |
| **CASE TITLE** | Paul Monfardini vs. Dwight Quinlan, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
      ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter memorandum opinion and order. Defendant Vico Associates, Inc.'s motion to compel production of documents pursuant to subpoenas from United Group, Inc., and from the Law Firm of Godrey, Leibsle, Blackbourn & Howarth [143-1] is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| ✓ | No notices required, distributed in open court. | | 1 – Gottschall number of notices | Document Number |
|---|---|---|---|---|
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | MAR 15 2004 date docketed | 172 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | GMA docketing deputy initials | |
| | Mail AO 450 form. | | | |
| ✓ | Copy to judge/magistrate judge. | | | |
| IS | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PAUL MONFARDINI, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 02 C 4284 |
| | ) | |
| v. | ) | Judge Joan B. Gottschall |
| | ) | |
| DWIGHT QUINLAN, ERIC SIECH, and | ) | Magistrate Judge |
| VICO ASSOCIATES, INC., | ) | Martin C. Ashman |
| | ) | |
| Defendants. | ) | |

DOCKETED
MAR 1 5 2004

## MEMORANDUM OPINION AND ORDER

This case is before the Court on Defendant Vico Associates, Inc.'s Motion to Compel Production of Documents Pursuant to Subpoenas from United Group, Inc., and from the Law Firm of Godfrey, Leibsle, Blackbourn & Howarth. For the following reasons, Vico's motion to compel is granted.

### I. Background

Plaintiff Paul Monfardini is a former shareholder of Vico.[1] In January of 2000, Monfardini entered into a Stock Purchase Agreement with Defendants Dwight Quinlan and Eric Siech. Under the terms of the agreement, Monfardini agreed to sell seventy-five shares of Vico stock each to Quinlan and Siech. Quinlan and Siech admit that they have not made any payments required by the agreement since January 2002. As a result of their non-payment,

---

[1] Further factual background in this case is set forth in this Court's earlier Memorandum Opinion and Order and familiarity with such facts is presumed. *Monfardini v. Quinlan*, No. 02 C 4284, 2003 WL 21384642, at *1-2 (N.D. Ill. June 12, 2003).

172

Monfardini filed this action against Quinlan and Siech and later amended the complaint to add Vico as a defendant.

Quinlan and Siech answered and filed a counterclaim against Monfardini. They allege fraudulent conduct and breach of fiduciary duty in the sale of the stock. Their allegations stem from Vico and Monfardini's relationship to United Group., Inc., of which Monfardini was President and Chief Operating Officer. Prior to the sale of the Vico stock, Vico depended on United Group for a substantial portion of its business. After the sale of the stock, United terminated its business relationship with Vico, and the value of the stock that Monfardini had sold to Quinlan and Siech dropped. Quinlan and Siech allege that Monfardini knew that United was considering substantially altering or terminating its business relationship with Vico prior to the sale of the stock. Vico responded that Monfardini is acting in breach of his fiduciary duties to Vico.

## A. The Formation and Organization of United

Vico's relationship to United stems back to 1988.[2] Monfardini helped form United at the request of a manufacturing company that provided a major source of income for Vico. Initially, United was owned entirely by the owner of the manufacturing company. United provided marketing services to the company and subcontracted field sales work to Vico. In 1991, United issued stock to Monfardini, and he became a 50% shareholder in United as well as its President. Subsequently, the other owner was bought out, and Monfardini became the sole shareholder of

---

[2] Vico claims that United Group was a "controlled spin-off" of Vico, which United contests, but it is clear that the companies have had a close relationship since United was formed. (*See* Dickinson Aff. ¶ 4; Monfardini Aff. ¶ 2.)

United which then provided marketing, sales, and distribution services for its new clients. Field sales services were outsourced to Vico.

At some date undisclosed to the Court, Monfardini gifted United stock to other individuals. Several of those individuals also owned Vico stock, but Vico as a corporation was never a shareholder of United. By November 1999, the stock ownership of United was as follows: Brad Dickinson 25%; Tom Noser 15%; Monfardini 25%; Fred Edmonds 25%; and Scott Radtke 15%. Dickinson, Noser, and Monfardini (owning a combined total of 65% of United stock) were also shareholders of Vico stock and Dickinson was a director of Vico.

On May 11, 2000, the United shareholders held a meeting at which a court reporter and attorney Robyn Fuller from the Godfrey, Leibsle firm were present. Monfardini stated at the meeting that Ms. Fuller represented United, and not any individual shareholder. At the meeting, the issuance of an additional 760 shares of United stock was authorized with 460 shares to go to Edmonds, and 300 to go to Radtke. Noser and Dickinson voted against the issuance of the additional shares but were outvoted by the other three shareholders. Thus, the stock ownership of United became: Dickinson 14.2%; Noser 8.5%; Monfardini 14.2%; Edmonds 40.3%; and Radtke 22.8%. Edmonds and Radtke, who did not own stock in Vico, together owned 63.1%. When Monfardini's shares were added in, the three together owned 77.3% of the United stock.

### B. Vico's Assignment of Monfardini to United

Seven years prior to these events, in 1993, the stockholders of Vico, which included Monfardini, had entered into an agreement assigning Monfardini as an employee of Vico to

United in the capacity of President and Operations Manager of United.[3] According to the agreement, the stockholders felt "that since Vico represents and receives income from the United Group, it is in Vico's best interest that Paul Monfardini's day to day activities be spent managing the United Group, Inc." Vico was to pay Monfardini's salary, and United would reimburse Vico for the full amount. Also in 1993, the Vico shareholders entered into a contemporaneously dated "Stockholders Buy-Sell Agreement" under which Vico was given the option of purchasing the stock of a shareholder who ceased to be a full-time employee of Vico. (Vico Ex. to Reply ¶ 4.1.) An exception to the option to repurchase stock was allowed for a former employee who became employed by "an affiliate or subsidiary of [Vico], at the written request of [Vico]." (Vico Ex. to Reply ¶ 4.5(c).)[4]

In July 1999, the assignment agreement was amended. The new agreement reflected a pay increase for Monfardini, to be paid by Vico, which would still be fully reimbursed by United. Monfardini was to continue to hold the position of President of United, and would additionally become its Chief Operating Officer. The agreement was also modified to state that it was in Vico's best interest that Monfardini's day to day activities "be spent managing and growing" United, as opposed to merely "managing" it.[5]

---

[3] The agreement was signed by Edmonds, Monfardini, Dickinson, Noser, and Michael Chilton.

[4] The buy-sell agreement was not provided to the Court until Vico's Reply was filed and United did not object to the exhibit.

[5] Vico claims that when Monfardini prepared the new salary agreement, he represented to the Vico board that it was the same as the 1993 agreement. Vico claims that Monfardini "used this alteration to secretly earn more money directly from [United]." (Dickinson Aff. ¶ 9.) There
(continued...)

Turning to the issue at hand, Vico has requested identical documents from United and from Godfrey, Leibsle seeking communications between United and its attorneys. Vico seeks these documents to prove that Monfardini engaged in an ongoing plan to dilute the United stock and put the majority power in the hands of Monfardini and his allies before terminating United's relationship with Vico. Vico alleges that Monfardini had been planning to defraud Quinlan and Siech as well as breach his fiduciary duty to Vico well in advance of the May 11, 2000 United shareholders meeting. United and Godfrey, Leibsle respond that the documents, while they relate to the issuance of additional United stock, are protected by the attorney-client privilege. Counsel for the parties have made a good faith effort to resolve this issue but have been unable to do so.

## II. Discussion

The issue before the Court revolves around the attorney-client privilege. Vico first argues that the attorney-client privilege never arose, because United could have no reasonable expectation that legal advice given to United would be privileged as to Vico, due to the close relationship between the entities and the fact that shareholders holding 65% of the stock of United were also Vico shareholders. It next argues that Monfardini owed a fiduciary duty to Vico, and that the fiduciary exception overcomes any privilege that may have existed with respect to confidential communications given to United and Monfardini. Vico also argues that

---

[5](...continued)
is no need to reach the merits of this contention for purposes of this opinion, although we note that the document is less than one page long and could easily have been read by the other shareholders.

the documents are discoverable under the fraud/tort exception to the attorney-client privilege, and the crime/fraud exception to the work product privilege.[6]

Godfrey, Leibsle and United respond that the documents are privileged, and that the fiduciary exception does not apply because Monfardini, either as a minority shareholder of Vico or an employee of Vico, did not owe a fiduciary duty to Vico. They also argue that any actions taken by Monfardini to further United's business success were implicitly approved by Vico's decision to assign Monfardini to work for United and serve as its President and COO. They also claim that as the situation degenerated between Vico, United, and their respective shareholders, Godfrey, Leibsle was consulted in anticipation of litigation, and the documents are protected by the attorney work product doctrine.

### A.     The Fiduciary Exception to the Attorney-Client Privilege

The purpose of the attorney-client privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Nevertheless, because the privilege effectively withholds relevant information from the factfinder, it should be applied only when necessary to achieve its purpose. *Fisher v. United States*, 425 U.S. 391, 403 (1976).

Under the fiduciary exception to the attorney-client privilege, a communication between a client and its attorney is not privileged from those to whom the client owes a fiduciary duty.

---

[6] The Court does not find these remaining arguments persuasive, and in any event, declines to reach these issues due to its decision that the documents are discoverable on other grounds.

*Ferguson v. Lurie*, 139 F.R.D. 362, 365 (N.D. Ill. 1991). The party claiming the exception must generally demonstrate the fiduciary relationship and good cause for overcoming the privilege.[7] To determine good cause, the court must take into account such factors as whether the party seeking the information asserts a colorable claim, whether the information is available elsewhere, whether the information relates to past or present actions, and whether the information may reveal confidential information. *J.H. Chapman Group, Ltd. v. Chapman*, No. 95 C 7716, 1996 WL 238863, at *1 (N.D. Ill. May 2, 1996).

Vico relies upon cases such as *In re Diasonics Securities Litigation*, 110 F.R.D. 570 (D. Col. 1986), and *Bailey v. Meister Brau, Inc.*, 55 F.R.D. 211 (N.D. Ill. 1972). In *Diasonics*, a shareholder derivative action, the Diasonics corporation acquired the closely held Fischer corporation, which became its wholly owned subsidiary. The partial owner and president of the Fischer corporation, Morgan Nields, became president of Diasonics after the merger. While still president of Diasonics, Nields sought legal advice about rescinding the sale as a former Fischer shareholder and on Fischer's behalf. The court held that because Nields was an officer and director of Diasonics at the time the legal advice was sought, he had a fiduciary responsibility to the Diasonics shareholders. 110 F.R.D. at 574. A fiduciary cannot withhold communications with an attorney from the persons to whom he has a fiduciary responsibility. *Id.* at 575. Therefore, any communications between Nields, the fiduciary, and his attorneys[8] were not

---

[7] We note that some courts have moved away from the good cause requirement in cases that are not shareholder derivative actions. *E.g. Wsol v. Fiduciary Mgmt. Assocs., Inc.*, 99 C 1719, 1999 WL 1129100 (N.D. Ill. Dec. 7, 1999).

[8] The court also noted that Nields was acting on his own behalf and not for the benefit of
(continued...)

confidential or protected by the attorney-client privilege and the documents were deemed discoverable. *Id.* at 574-75.

A dual fiduciary capacity situation was also addressed in *Meister Brau*. In *Meister Brau*, defendant Meister Brau, Inc., purchased the Black Company. Prior to the sale, Defendant Cappadocia, who already served as a Meister Brau senior vice president, was installed as president and chairman of the board of the Black Company. Cappadocia conversed with Meister Brau's counsel regarding Meister Brau business (specifically, the acquisition of the Black Company) prior to the sale, but while he was already on the board of directors of the Black Company. The plaintiff, a shareholder of the Black Company, sought information regarding those communications. Cappadocia refused to answer the questions regarding the communications, claiming they were protected by the attorney-client privilege. The court held that Cappadocia, as an officer of the Black Company, was a fiduciary to the plaintiff-shareholder, and could not "turn his responsibilities on and off like a faucet . . . . As long as that duty [to the Black Company shareholders] existed, so did the concomitant interest of the Black Company shareholders in knowing his legal communications concerning the future of their company." 55 F.R.D. at 214. The Black Company shareholders' interest in knowing the legal communications was even stronger because Cappadocia's communications were with counsel for a party (Meister Brau) whose interests were potentially adverse to those of the shareholders. *Id.* The interest was sufficient to outweigh the interests served by confidentiality. Thus, even though Cappadocia also owed a fiduciary duty to the Meister Brau shareholders, and was the

---

⁸(...continued)
Fischer. *Id.* at 574.

only Meister Brau officer with a dual duty to the Black Company shareholders, the court found it sufficient to outweigh Meister Brau's attorney-client privilege and provide the Black Company shareholders with information relating to Meister Brau's business.

## B. Fiduciary Duties of Shareholders in Close Corporations

Although these cases are helpful in illustrating the fiduciary exception, they are not exactly on point, as Monfardini is not a director or officer of Vico.[9] Any potential fiduciary duty he owes to Vico is not as clear cut as in the cases described above. Vico argues that shareholders in a close corporation owe a fiduciary duty to the other shareholders. United responds that shareholders, even shareholders of close corporations, do not necessarily owe fiduciary duties to each other.

While neither side addresses whether Vico and United are organized as close corporations, we find that they both fit the common law definition of a close corporation: they are both corporations which have stock held by only a few people and the stock is not, or rarely, bought or sold. *See Dowell v. Bitner*, 652 N.E.2d 1372, 1378 (Ill. App. Ct. 1995). We also find, based on the particular factual situation in this case, that Monfardini did owe a fiduciary duty to Vico with respect to actions he took on United's (or his own) behalf that affected Vico.

The Court agrees with United that "something more than mere status as a shareholder in a close corporation is required to impose a fiduciary duty" on the shareholder. *See Dowell*, 652 N.E.2d at 1379. Rather, as the court in *Dowell* noted, "it could be argued that Illinois courts look

---

[9] United does not appear to be a subsidiary of Vico, or even an affiliate, as Vico itself does not own any United stock. Rather, the companies merely have some shareholders in common.

at a shareholders' ability to hinder, influence, or control the corporation when determining whether a shareholder has a fiduciary duty to other shareholders." *Id.* For example, when a close corporation consists of only two equal or near-equal shareholders, a fiduciary duty is found because the relationship is akin to that of partners or joint venturers and each shareholder has great influence over the corporate business. *Hagshenas v. Gaylord*, 557 N.E.2d 316, 322-23 (Ill. App. Ct. 1990). When the close corporation consists of more than two shareholders, a fiduciary duty can still be found in certain circumstances. Majority shareholders have the duty to not engage in conduct that is oppressive to minority shareholders. *Rexford Rand Corp. v. Ancel*, 58 F.3d 1215, 1219 (7th Cir. 1995). Minority shareholders have an obligation to not damage the corporate interests. *Id.* Minority shareholders may also owe a fiduciary duty to the corporation when their interests are controlling on a particular issue. *Id.* at n.10. These duties may extend even after a minority shareholder is frozen out or he resigns as a director, but, once again, only if he has the ability to hinder, influence, or control the corporation. *Dowell*, 652 N.E.2d at 1379.

In the case before the Court, we find that Monfardini's ability to hinder or influence (whether he exercised this ability or not) Vico through his actions taken as a *de facto* employee and director of United, require a finding that he owed a fiduciary duty to Vico with respect to actions taken at United. As we have noted, regardless of the origins of United, it is clear that from the beginning it shared a close relationship with Vico. In 1993, the shareholders of Vico agreed that Monfardini would best serve Vico by acting as an employee, officer, and operations manager of United. The shareholders took this action because Vico represented and received income from United. Clearly, the Vico shareholders were looking for a way to keep their fingers

in the United pie, and possibly to get a larger slice. In 1999, the assignment agreement was amended to provide for a pay increase for Monfardini, to allow him to become COO, as well as indicate that it was in Vico's best interest that Monfardini's day to day activities be spent growing and managing United. Although Vico chose to argue that its other shareholders did not realize Monfardini was now supposed to "grow" United, it could be argued that the shareholders could have expected an increased income and business flow from United as it grew. Regardless, Monfardini had the responsibility to not hinder Vico through his actions at United. Vico did not give him *carte blanche* to take whatever actions were best for him or even for United; rather, the agreements were entered into with the understanding that it was *Vico's* best interests that were to be considered.

After reaching the conclusion that Monfardini owed a fiduciary duty to Vico, we next must address the issue of whether Monfardini's fiduciary duty is sufficient to cause an exception to United's attorney-client privilege. Based on *Meister Brau*, we find that the communications dealing with United's stock as it affects Vico fall under the exception. In *Meister Brau*, as discussed, a dual fiduciary duty to two corporations was found. The communications regarding Meister Brau with Meister Brau's attorneys were subject to discovery due to the duty that was owed to the shareholders of the Black Company, even though the privilege belonged to Meister Brau, not the president. Likewise, Monfardini had dual fiduciary duties to Vico and United, and the communications regarding United's issuance of the stock as it related to Vico fall under the exception due to the duty owed to Vico. Good cause also exists because Vico may need this information to defend itself, the information is not readily available from other sources, the information sought relates to past communications and should not implicate current attorney

- 11 -

client communications, and the information sought does not reveal other confidential information. *See Chapman*, 1996 WL 238863, at *2.

We note that Monfardini sold his Vico stock to Quinlan and Siech under an agreement backdated to January 1, 2000. He was terminated from his Vico employment effective August 3, 2000. Some of the documents requested post-date his final termination from Vico. However, the duty of loyalty continues even after employment is terminated or the shareholder is removed from the board of directors, if he retains the ability to hinder or influence the corporation. *Cf. Dowell*, 652 N.E.2d at 1379; *Rexford Rand*, 58 F.3d at 1220 (frozen out shareholder retained duty to not harm corporation by appropriating its corporate name). Additionally, the exception applies to communications relating to events initiated while Monfardini still had a fiduciary relationship to Vico. Therefore, even documents created after Monfardini was terminated from Vico must be produced.

### III. Conclusion

For the foregoing reasons, Vico's motion to compel is granted. However, based on the analysis above, the documents should be produced to Vico, but Vico is ordered to not disclose these documents or any information contained therein to Quinlan or Siech.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
Dated: March 11, 2004.          United States Magistrate Judge

Copies have been mailed to:

| | |
|---|---|
| LISLE W. BLACKBOURN, Esq.<br>Godfrey, Leibsle, Blackbourn<br> & Howarth, S.C.<br>11 North Wisconsin Street<br>Post Office Box 260<br>Elkhorn, WI 53121<br><br>STEPHEN P. BEDELL, Esq.<br>Gardner, Carton & Douglas<br>Quaker Tower<br>191 North Wacker Drive<br>Suite 3700<br>Chicago, IL 60606-1698<br><br>Attorneys for Plaintiff | ANDREW J. MAXWELL, Esq.<br>Law Offices of Andrew J. Maxwell<br>105 West Adams Street<br>Suite 3200<br>Chicago, IL 60603<br><br>TOBIN M. RICHTER, Esq.<br>Neal, Murdock & Leroy, L.L.C.<br>203 North LaSalle Street<br>Suite 2300<br>Chicago, IL 60601<br><br><br><br><br>Attorneys for Defendants |